ATTORNEY GENERAL, *ex rel.* STATE BANKING COMMIS-
SIONER, *v.* MICHIGAN NATIONAL BANK.
GRAND LEDGE STATE BANK *v.* STATE
BANKING COMMISSIONER.

#### OPINION OF THE COURT.

1. MONOPOLIES—DEFINITION.

A monopoly is created when previously competing businesses are
so concentrated in the hands of a single person or corporation,
or a few persons or corporations acting together, that they have
power to practically control the prices of commodities and
thus to practically suppress competition.

2. SAME—ELIMINATION OF COMPETITION.

Monopoly resulting from the practical elimination of effective
business competition thereby creating a power to control prices
to the harm of the public is determined in the light of the
relevant market.

---

#### REFERENCES FOR POINTS IN HEADNOTES

[1] 36 Am Jur, Monopolies, Combinations and Restraints of Trade
§ 2.
[2, 7] 36 Am Jur, Monopolies, Combinations and Restraints of Trade
§ 6.
[3, 8, 11, 13, 17, 18, 20–22] 36 Am Jur, Monopolies, Combinations
and Restraints of Trade §§ 87 (supp), 95 (supp).
Application to banks and banking institutions of antimonopoly or
antitrust laws. 83 ALR2d 374.
[5] 36 Am Jur, Monopolies, Combinations and Restraints of Trade
§ 9.
[6] 36 Am Jur, Monopolies, Combinations and Restraints of Trade
§ 8.
[9] 44 Am Jur, Quo Warranto § 129.
[10] 10 Am Jur 2d, Banks § 28; 36 Am Jur, Monopolies, Combina-
tions and Restraints of Trade §§ 87 (supp), 95 (supp).
[12] 44 Am Jur, Quo Warranto § 131.
5 Am Jur 2d, Appeal and Error §§ 820, 823, 839 *et seq.*
Advantage which the original trier of facts enjoyed over reviewing
court from opportunity of seeing and hearing witnesses. 111 ALR
742.
[14] 5 Am Jur 2d, Appeal and Error § 1009.
[15] 10 Am Jur 2d, Banks § 24.
[19] 50 Am Jur, Statutes § 534.

3. SAME—BANKS.
   Banks are subject to State antimonopoly regulations.

4. BANKS AND BANKING—INCONVENIENCE—COMPETITION.
   The factor of inconvenience effectively localizes banking competition.

5. MONOPOLIES—STATUTES—RULE OF REASON—PUBLIC INTEREST.
   Antitrust and antimonopoly statutes are applied in this State pursuant to the rule of reason, the overriding test being the protection of the public interest (CL 1948, §§ 445.701–445.712, 445.761–445.767).

6. SAME—TESTS OF UNREASONABLE RESTRAINT OF TRADE.
   Unreasonable restraint of trade is determined by the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market.

7. SAME—ELIMINATION OF COMPETITION.
   An agreement or scheme, the manifest object of which is to acquire control over a competitor through acquisition of its capital stock for the purpose of extinguishing competition, is *per se* in violation of the antimonopoly laws (CL 1948, §§ 445.701–445.712, 445.761–445.767).

8. SAME—SALE OF BANKS—FINDING OF COURT—QUO WARRANTO.
   Finding of trial court in quo warranto proceeding against sellers and purchaser of 2 banks in a relevant market area of 10,340 the sale and purchase of the assets were the result of open and competitive bidding between the purchaser and another bank and that the transaction did not violate the antimonopoly laws of the State *held*, supported by record showing the sale to have been one of economic necessity (CL 1948, §§ 445.701–445.712, 445.761–445.767).

9. APPEAL AND ERROR—QUO WARRANTO—BANKS AND BANKING—STATUTES—MONOPOLIES.
   Whether provision of financial institutions act relative to number of banks which may be established in a city or township is a valid defense to prosecution in quo warranto proceeding for violation of State antimonopoly statute, *is not determined on appeal*, where sale of 2 banks to purchaser is found not to be in violation of such statutes, when rule of reason is applied (CL 1948, §§ 445.701–445.712, 445.761–445.767, 487.26).

10. SAME—SALE OF BANK ASSETS—APPROVAL OF BANKING COMMISSIONER—MONOPOLIES.

Whether State banking commissioner was justified in refusing to approve sale of assets of the only 2 banks in a community to a purchasing bank is not determined, where the transaction is found not to have constituted a violation of the State anti-monopoly statutes (CL 1948, §§ 445.701–445.712, 445.761–445.767, 487.26).

11. BANKS AND BANKING—SALE OF ASSETS—AWARDS TO OFFICERS.

Claim of State banking commissioner in quo warranto proceedings that intrigue and questionable tactics were used in effecting sale of assets of 2 defendant banks to defendant purchaser by reason of promising significant individual awards to principal officers of the 2 banks *held,* not sustained, where similar offers were made by would-be purchaser in open competition with defendant purchaser and stockholders knew of the situation before voting approval of the sale.

12. QUO WARRANTO—FINDING OF TRIAL JUDGE—SUPREME COURT.

The Supreme Court accords great weight to the fact findings of the trial judge because of the opportunity of the judge to see the witnesses testify and observe their demeanor, and will not reverse the judgment of the trial court in quo warranto unless it appears to be clearly erroneous (GCR 1963, 859).

13. BANKS AND BANKING—SALE OF BANKS—MONOPOLIES.

Trial court's findings in quo warranto proceeding to enjoin defendant national bank purchaser from monopolizing banking business of city by purchase of assets of 2 existing State banks that such transaction was not a monopoly contrary to State law and that State banking commissioner acted unreasonably in refusing to approve the sale are affirmed under record supporting such findings (CL 1948, §§ 445.701–445.712, 445.761–445.767).

14. COSTS—PUBLIC QUESTION—SALE OF BANKS.

No costs are allowed on appeal from order of circuit court refusing to enjoin sale to national bank of assets of 2 State banks and setting aside State banking commissioner's order refusing to approve the transaction, a public question being involved (CL 1948, §§ 445.701–445.712, 445.761–445.767, 487.26).

SEPARATE OPINION.

ADAMS, J.

15. BANKS AND BANKING—POPULATION—STATUTES.

*Statute establishing public policy that there be only 1 bank in a city of less than 6,000 population was prospective from date of enactment and did not apply to city wherein 2 banks had been established prior to enactment (CL 1948, § 487.26).*

16. SAME—LOCALIZED BUSINESS.

*Proposition that banking is a localized business would be open to searching scrutiny, where controverted.*

17. MONOPOLIES—BANKING—EXEMPTIONS.

*Banking is not specifically exempted in the State antimonopoly laws either by such laws or by the State financial institutions act (CL 1948, §§ 445.701–445.712; 445.761–445.767, 487.1 et seq.).*

18. BANKS AND BANKING—PUBLIC POLICY—MONOPOLIES.

*State policy, as evidenced by the financial institutions act, permitting creation and maintenance of 1-bank cities, evidences a concern for the stability and economic soundness of the banks that may, in some situations, be placed above the maintenance of free and unlimited competition (CL 1948, § 487.1 et seq.).*

19. STATUTES—IMPLIED REPEALS.

*Repeals by implication are not favored.*

20. SAME—REPEALS—FINANCIAL INSTITUTIONS ACT—ANTIMONOPOLY LAW.

*The State financial institutions act neither expressly nor impliedly exempted banking from the operation of the previously enacted State antimonopoly laws (CL 1948, §§ 445.701–445.712, 445.761–445.767, 487.1 et seq.).*

21. BANKS AND BANKING—ECONOMIC NECESSITY.

*Economic necessity with which 2 defendant State banks were faced requiring that they either merge or sell to defendant purchaser or competitor bidder held, to have afforded justification for approval of sale of assets, where stockholders were to receive an attractive price, employees were to continue in employment, officers were to receive attractive retirement plans, and the community was to receive adequate services in a modern facility (CL 1948, § 487.26).*

22. MONOPOLIES—BANKS—EVIDENCE.

*Unlawful monoply outside of local area held, not to have been proved in quo warranto proceeding by which State banking*

*commissioner sought to prevent sale of 2 State banks to a national bank (CL 1948, § 487.26).*

Appeal from Ingham; Coash (Louis E.), J. Submitted May 11, 1965. (Calendar Nos. 20, 21, Docket Nos. 51,036, 51,037.) Decided April 5, 1966.

Information in nature of quo warranto by Frank J. Kelley, Attorney General, on the relation of Charles D. Slay, State Banking Commissioner, to enjoin Michigan National Bank from monopolizing the banking business in the City of Grand Ledge through the purchase of defendants Grand Ledge State Bank and Loan and Deposit State Bank. Information dismissed.

Complaint by Grand Ledge State Bank, Loan and Deposit State Bank, and Michigan National Bank against Charles D. Slay, State Banking Commissioner, to vacate defendant's refusal to approve sales, purchases, and liquidations, and to compel approval. Judgment for plaintiffs.

Cases consolidated for trial and appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Maurice M. Moule* and *Maxine Boord Virtue,* Assistant Attorneys General, for State Banking Commissioner.

*Fraser, Trebilcock, Davis & Foster* and *Butzel, Eamon, Long, Gust & Kennedy (Victor W. Klein* and *Harold A. Ruemenapp,* of counsel), for Michigan National Bank.

*Hudson E. Deming,* for Grand Ledge State Bank.

*Louis E. Wirbel (Miller, Morris & Pappas,* of counsel), for Loan & Deposit State Bank.

T. M. KAVANAGH, C. J.   On the relation of the banking commissioner, the attorney general sought by quo warranto to prevent the Michigan National Bank, the main office of which is in Lansing, from purchasing the assets and assuming the liabilities of the two Grand Ledge State banks, which banks thereupon were to be liquidated and a branch or branches of the Michigan National Bank established in Grand Ledge.   The attorney general alleged that such transactions would create a monopoly contrary to State law,[1] in the banking business in the Grand Ledge service area.

The two Grand Ledge State banks filed a complaint against the banking commissioner seeking to set aside the commissioner's order of March 10, 1964, refusing to approve the sales, purchases, and liquidation of the two banks by arrangement with the Michigan National Bank.   The cases were consolidated for pretrial and trial, since they involved the same factual transactions and issues.

Following trial, the circuit court found as a matter of fact that: the growth of the two Grand Ledge State banks over the past five years was substantially less than other banks in the area; one of the banks had an acute management succession problem; neither bank had the trained personnel necessary to offer modern banking services to the community, such as Federal Housing Administration (FHA) and Veterans Administration (VA) loans or trust department services; an increase of the interest rate to four per cent (which many banks were already paying) would present serious financial difficulties to both banks; both banks, due to increased competition from credit unions, building and loan associations, and insurance companies were experiencing grave difficulties in procuring sufficient high-yield

---

[1] CL 1948, §§ 445.701–445.712;   445.761–445.767 (Stat Ann 1962 Rev §§ 28.31–28.39; 28.61–28.67).

loans; and the proposed transactions resulted from good faith, open, competitive bidding between Michigan National Bank and another Lansing bank, the American Bank & Trust Company.

In addition to these facts, from which the trial court found not only economic necessity but a lack of modern banking facilities in Grand Ledge, it should be noted that the city of Grand Ledge attempted to intervene as a party defendant in the attorney general's suit in order to show that the city of Grand Ledge was not adequately served by the two State banks and that the proposed sale and liquidation would benefit the city of Grand Ledge. The comptroller of currency of the United States in approving the acquisition of the assets and assumption of the liabilities of the banks by the Michigan National Bank stated: "While consummation of this proposal [and operation of the State banks' offices in Grand Ledge as branches of the Michigan National Bank] will have no significant consequences in the city of Lansing, it will produce marked benefits for the public in the Grand Ledge area."

The trial court concluded that section 26 of the Michigan financial institutions act[2] announces a public policy that a community of less than 6,000 is better served by only one bank or branch, and that section 26 should be read in connection with the antimonopoly laws of the State. Judgment was entered accordingly and plaintiff attorney general for himself, and in the companion case on behalf of the defendant banking commissioner, appealed.

The questions at issue are: (1) whether the acquisition of the assets and assumption of liabilities of the two Grand Ledge State banks, the operation of their offices as branches of the Michigan National Bank, and alleged resulting monopolization of the

---

[2] CL 1948, § 487.26 (Stat Ann 1957 Rev § 23.754).

banking business in the Grand Ledge market area by
Michigan National Bank is a violation of the Mich-
igan antimonopoly laws, or alternatively, whether
the purchases and alleged resulting monopolization
by Michigan National Bank is justified by economic
necessity; (2) whether the acquisition of the assets
of the two Grand Ledge State banks and the asserted
resulting monopolization of banking business in the
Grand Ledge market area by Michigan National
Bank were justified by the legislative policy declara-
tion in section 26 of the Michigan financial institu-
tions act; and (3) whether the Michigan banking
commissioner was justified in refusing to approve
sale of the assets of the two Grand Ledge State
banks to the Michigan National Bank because of
the personal interests of the officers of the two State
banks therein and because of the alleged monopolis-
tic nature of the transaction.

The attorney general claims that the result would
constitute an illegal monopoly under the Michigan
antimonopoly laws simply because Michigan Na-
tional Bank would thereby obtain roughly 92% of
all the banking business in the city of Grand Ledge
and a 5-mile area surrounding it, which has been
stipulated to be the market area for the purposes
of this case.

In order to determine what a monopoly is, we
must turn to the definitions of the courts. The
Michigan Supreme Court, quoting *United States* v.
*American Tobacco Co.* (CC SD NY) 164 F 700, 721,
has approved the following definition of a monopoly:

" 'A monopoly, in the modern sense, is created
when, as a result of efforts to that end, previously
competing businesses are so concentrated in the
hands of a single person or corporation, or a few
persons or corporations acting together, that they
have power to practically control the prices of com-
modities and thus to practically suppress competi-

tion.' "  *Attorney General, ex rel. James, v. National
Cash Register Co.,* 182 Mich 99, 107 (Ann Cas
1916D, 638); *People, ex rel. Attorney General,* v.
*Detroit Asphalt Paving Co.,* 244 Mich 119, 122, 123.

In *Peoples Savings Bank* v. *Stoddard* (1960), 359
Mich 297, 329 (83 ALR2d 344), this Court said:

"Monopoly may be said to be the result of the
practical elimination of effective business competi-
tion which thereby creates a power to control prices
to the harm of the public."

1. CCH Trade Reg Rep (1965), par 1530, Geo-
graphic and Product Market, says:

"The existence of monopoly power is determined
in the light of the market involved, that is, the
relevant market."

Although it was once thought by some that bank-
ing could not be the subject of a monopoly (5 Toul-
min's Anti-Trust Laws, Banking [Anderson ed
1950], § 2.1, p 57), this is not the prevailing view
and in Michigan since 1960 banks have been held
subject to the State's antimonopoly laws. *Peoples
Savings Bank* v. *Stoddard, supra.*  However, once
banks are subjected to antimonopoly regulation, one
must determine just what is the relevant market
area of any banking community.

To determine "market area" we may again turn
to the Supreme Court's definition.  The United
States Supreme Court in *United States* v. *Philadel-
phia National Bank* (1963), 374 US 321, 359 (83 S
Ct 1715, 10 L ed 2d 915), used the following test
in a case involving violation of the Federal antitrust
laws:

"Therefore, since, as we recently said in a related
context, the 'area of effective competition in the
known line of commerce must be *charted by careful*

*selection of the market area in which the seller
operates, and to which the purchaser can practicably
turn for supplies,' Tampa Electric Co.* v. *Nashville
Coal Co.,* 365 US 320, 327 (81 S Ct 623, 5 L ed 2d
580)." (Emphasis supplied.)

The court held that the relevant market area was
the four-county area around Philadelphia. In sup-
port of the concept that the relevant market in
regard to banking can be quite small, the Supreme
Court of the United States has determined that the
relevant area can be confined to one county.

"We also agree with the district court that the
consolidation should be judged in light of its effect
on competition in Fayette county. The record estab-
lishes that, here, as in *United States* v. *Philadelphia
National Bank,* * * * the 'factor of inconvenience'
does indeed localize banking competition 'as effec-
tively as high transportation costs in other indus-
tries.' " *United States* v. *First National Bank &
Trust Co. of Lexington,* 376 US 665, 668 (84 S Ct
1033, 12 L ed 2d 1).

In *Peoples Savings Bank* v. *Stoddard, supra,* the
Michigan Supreme Court, without discussing the
problem, applied the antimonopoly statute to one
city, Port Huron, with a population of 35,000.

In the case at bar, the admitted relevant market
area is the city of Grand Ledge and the immediate
area within a radius of 5 or 6 miles with a popula-
tion of 10,340. If the proposed sale and liquidation
of the two State banks are approved, upon com-
mencement of business in the offices of the State
banks as branches Michigan National Bank will have
acquired over 90% of the banking business in the
Grand Ledge area.

The Michigan Supreme Court has adopted the
"rule of reason" in applying antitrust and anti-
monopoly statutes. *Hubbard* v. *Miller,* 27 Mich 15

(15 Am Rep 153).; *Staebler-Kempf Oil Company* v. *Mac's Auto Mart, Inc.,* 329 Mich 351; *People, ex rel. Attorney General,* v. *Detroit Asphalt Paving Co.,* 244 Mich 119.

"Some State courts and the lower Federal courts early reached the conclusion that the various acts applied to all transactions which in any way operated in restraint of trade, in reduction of competition, whether direct or incidental, reasonable or unreasonable, and the Federal Supreme Court gave color and encouragement to such construction. But such a construction could not long last unless all business was to be put in a strait-jacket. Two grocerymen in a small town could not combine their stocks in one store and form a partnership without lessening competition, and thus violating the antitrust law of the State if such construction obtained. A county newspaper could not buy out its competitor without becoming amenable to the law. Illustrations could be multiplied." *People, ex rel. Attorney General,* v. *Detroit Asphalt Paving Co., supra,* p 123.

Therefore, it is not every combination which restrains trade or tends to reduce competition that is illegal; only those which are unreasonable.

In the *Lexington* bank case, the Supreme Court of the United States, quoting *United States* v. *Columbia Steel Co.,* 334 US 495, 527 (68 S Ct 1107, 92 L ed 1533), set forth several tests to determine unreasonable restraint:

" 'In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of

.the market.' " *United States* v. *First National Bank & Trust Co. of Lexington* (1964), 376 US 665, 675, 676 (84 S Ct 1033, 12 L ed 2d 1).

And in *Peoples Savings Bank* v. *Stoddard, supra,* where defendants' purpose was regarded to be of prime significance to decision, this Court said (pp 329, 330):

"An agreement or scheme, the manifest object of which is to acquire control over a competitor through its capital stock for the purpose of extinguishing competition, is *per se* in violation of the antimonopoly laws [citing cases]."

In examining any combination, the overriding test, of course, is protection of the public interest. "But not every joinder of competing businesses or acquisition of instrumentalities that have been used in competition is an undue restraint of trade or a creation of a monopoly. Each situation must be measured by the rule of reason. And a fundamental test is injury to the public." 10 Fletcher, Corporations (1961 Rev), § 5003, p 1061.

In the information as amended, the attorney general charged that Michigan National Bank had for a considerable period of years been pursuing a plan or scheme in combination with various other persons to monopolize or attempt to monopolize the business of banking in numerous sections of the State of Michigan, and that the acquisition of the two Grand Ledge banks was in furtherance of such plan or scheme. In the proofs adduced at trial, the attorney general limited himself to an attack on the legality of the proposed liquidation and sale of assets of the Grand Ledge banks and failed to argue or prove a general intent, plan or scheme, alone or otherwise, to monopolize on the part of Michigan National Bank. At trial and here on appeal, the proposed acquisition of the banks was treated as

an isolated transaction, apart from any general attempt on the part of Michigan National Bank to monopolize the banking business in the State of Michigan.

In the findings of fact supported by the record, the lower court found that the sale and purchase of the assets of said banks were the result of open and competitive bidding between Michigan National Bank and American Bank & Trust Company. Finding no purpose or intent to monopolize and no unlawful or illegal tactics or means employed by Michigan National Bank, the lower court held that the transaction did not violate the antimonopoly laws of the State of Michigan.

There is evidence to support the trial court's finding that the Grand Ledge State banks did not have sufficient trained personnel to offer modern banking facilities, such as FHA or VA loans or trust department services.

Although the sale and liquidation will result in Michigan National Bank acquiring over 90% of the banking business of the Grand Ledge area, we believe no violation of the State's antimonopoly laws was established, since the transaction was founded not only on economic necessity and the need in the Grand Ledge community for modern banking facilities, but was the result of open, competitive bidding.

In addition, it should now be evident that the case of *Peoples Savings Bank* v. *Stoddard, supra,* is distinguishable on its facts since in that case the Court dealt with "a story of high finance and less lofty subterfuge" (p 306), in which there was no economic necessity present and the purpose of defendants was found to be the elimination of "its only general banking competition" in Port Huron (p 330). In *Stoddard,* this Court found (p 337) that "the circuit judge was correct in holding that the plan he found established by the testimony was an illegal

conspiracy." Unlike the case before us, the Court could find no justification for the elimination of all competition in the Port Huron banking area except to achieve monopoly power for defendants.

Since we agree with the trial court that sale of the two Grand Ledge State banks, measured by the rule of reason, would not violate the State anti-monopoly laws, it is not necessary to decide whether section 26 of the Michigan financial institutions act is a valid defense to prosecution for violation of the Michigan antimonopoly statutes. See, in this regard, *Peoples Savings Bank* v. *Stoddard, supra,* pp 331–333.

Similarly, in view of our holding it is not necessary to decide whether the banking commissioner was justified in refusing to approve the sale of assets of the two banks on the ground that the transactions were monopolistic.

Finally, the banking commissioner also refused to approve the sale because of "this intrigue, the questionable tactics." The commissioner admitted that by "this intrigue" he was referring to the fact that certain principal officers had been promised significant individual rewards. These questionable tactics consisted of participation in a pension plan and membership on an advisory board of directors.

However, there was evidence showing that the American Bank & Trust Company, in the course of competitive bidding, offered equivalent salary, pension, and employment arrangements in its proposal. Furthermore, the stockholders of both State banks voted approval of the sale and liquidation with full knowledge of the proposed pension plans and salary arrangements.

The trial court concluded that the board of directors of both State banks and the stockholders acted in good faith in agreeing to sell to Michigan National

Bank, that there were no unlawful or improper tactics or means employed by Michigan National Bank to purchase the assets of said banks, and that the purchase was the result of open and competitive bidding between Michigan National Bank and American Bank & Trust Company.

Great weight is given to the fact findings of the trial judge because of the opportunity of the judge to see the witnesses testify and observe their demeanor on the stand. We do not, under GCR 1963, 859,[3] reverse the judgment of the trial court unless it appears to this Court to be "clearly erroneous."

We find the trial court's findings, as to the issues of fact, in this case are supported by the evidence and not clearly erroneous and, therefore, affirm its judgment that, on the facts in this case, the proposed sales and liquidation did not constitute a monopoly contrary to State law, and that the banking commissioner acted unreasonably in refusing to approve the sale of the assets of the two Grand Ledge State banks to the Michigan National Bank.

No costs, a public question being involved.

DETHMERS, KELLY, SOURIS, SMITH, and O'HARA, JJ., concurred with T. M. KAVANAGH, C. J.

ADAMS, J. (*concurring*). I concur in the result reached by Chief Justice T. M. KAVANAGH for the following reasons:

The Grand Ledge State Bank and the Loan & Deposit State Bank established that, as a matter of economic necessity, they had to either merge, sell out, or liquidate.

Section 26 of the banking act (CL 1948, § 487.26 [Stat Ann 1957 Rev § 23.754]) requires that in a

---

3 373 Mich lxxxix.—REPORTER.

city or township of less than 6,000 there shall be only one bank.

Section 26 was prospective from the date of enactment. It does not apply to 18 cities (including Grand Ledge) with populations of less than 6,000, where two banks were in existence at the time section 26 was enacted. There are presently, however, 400 cities or townships in Michigan with less than 6,000 population that have only one bank. Section 26 clearly makes it the public policy of this State that there be only one bank in small cities or townships. It would be fully applicable to Grand Ledge upon the dissolution or liquidation of one or both of the banks existing in that community.

The parties to this case agreed that the banking business is very localized and that the relevant market area here involved is the city of Grand Ledge and not to exceed five miles around it. The proposition that banking is a localized business, if controverted, might be subject to searching scrutiny;*

---

\* "It is clear that just as the antimonopoly act [CL 1948, §§ 445-.701-445.712; 445.761-445.767 (Stat Ann 1962 Rev·§§ 28.31-28.39, 28.61-28.67)] contained no specific exemption as to banking, neither does the Michigan financial institutions act [CL 1948, § 487.1 et seq. (Stat Ann 1957 Rev § 23.711 et seq.)] contain a specific exemption as to monopoly. The addition of such exemption, if consistent with legislative intent, is so simple and so much to be expected, that the omission seems to us of great significance in determination of this issue.

"Nor does our examination of the scope of the Michigan financial institutions act uphold the 'comprehensive' argument advanced to us by defendants. For example, the power vested in the banking commissioner by sections 99 and 112 of the Michigan financial institutions act (CL 1948, §§ 487.99, 487.112 [Stat Ann 1957 Rev §§ 23.852, 23.865]) appears to be the examination of the proposed liquidation for the purpose of protecting depositors and creditors. If the public is protected from the sort of monopolistic practice in banking demonstrated in this case, the protection is not to be found in the Michigan financial institutions act.

"Defendants likewise argue with vehemence that in many other situations under express authority of the banking commissioner and authorization of the Michigan financial institutions act, 1-bank cities have been created or are being maintained in Michigan. We have no doubt that the Michigan financial institutions act has established, as a matter of State policy, a concern for the stability and economic

but since it is not, we must accept it for purposes of this case.

Once it is established that a local monopoly (due to the nature of the banking business) is authorized by virtue of section 26, and that liquidation of one or both of the Grand Ledge banks was an economic necessity, the question becomes—Who is to be permitted to carry on that local, legally sanctioned monopoly? I agree with Chief Justice T. M. KAVA-NAGH that this was a matter for open, competitive bidding by any interested party. The Grand Ledge banks had three alternatives—(1) to merge with each other; (2) to sell to the American Bank & Trust Company; (3) to sell to Michigan National Bank. Each alternative was carefully and exhaustively ex-

---

soundness of the banks in the State. These considerations have in some situations been placed above the maintenance of free and unlimited competition. We recognize, too, this State policy must be read in conjunction with any application of the antimonopoly law to banking.

"The purpose, however, is to protect the public against imprudent banking, not 'to deter competition or foster monopoly.'. *Moran* v. *State Banking Commissioner*, 322 Mich 230, 243.

"What prevents the application of this argument to this case is the fact that Port Huron was supporting, and obviously could continue to support, 2 general banking institutions. This was not a liquidation founded on economic necessity or demanding State approval on grounds of protection of depositors or creditors of any bank.

"Nor do we have before us any fact situation presenting the question of creation of monopoly through voluntary merger of previously competitive banks with banking commission approval under procedures established by the Michigan financial institutions act. While declining to pass on an issue clearly not before us, we note that if there are, or have been, other unrestrained violations of the antimonopoly laws, this fact could be of no benefit to defendants. *Society of Good Neighbors* v. *Mayor of Detroit*, 324 Mich 22; *Attorney General, ex rel. James*, v. *National Cash Register Co.*, 182 Mich 99 (Ann Cas 1916D, 638).

"Repeals by implication are generally not favored. *Washtenaw County Road Commissioners* v. *Public Service Commission*, 349 Mich 663; *People* v. *Buckley*, 302 Mich 12; *Edwards* v. *Auditor General*, 161 Mich 639. And we find nothing in the history or language of these 2 pieces of legislation to support an argument of legislative intention of implied repeal.

"We hold that the Michigan financial institutions act did not either expressly or by implication exempt banking from the operation of the Michigan antimonopoly laws." *Peoples Savings Bank* v. *Stoddard*, 359 Mich 297, 331–333 (83 ALR2d 344).

plored. Only after it was determined by the boards of directors and the stockholders of the Grand Ledge banks that the Michigan National Bank offer was the most attractive was that offer accepted. As a result of this competitive bargaining, the stockholders of the Grand Ledge banks will receive an attractive price for their stock, the employees of both banks will be assured continued employment and other benefits, the officers will receive attractive retirement plans in return for continued service and advice, and the community of Grand Ledge will be afforded adequate banking services in a modern facility.

The only *quid pro quo* established to Michigan National Bank for this is a local monopoly permitted under section 26. If this acquisition by Michigan National was in furtherance of an illegal and unlawful monopoly *outside* of the local area, there was a failure of proof to that effect.

Black, J., did not sit.